ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT NORTHERN DISTRICT OF TEXAS FILED

MAR 20 2014

CLERK, U.S. DISTRICT COURT
By ______ Deputy

UNITED STATES OF AMERICA

v.

FLORI MATI (01)
a/k/a "Florine Shaw"
DAVID MBUGUA (02)

Criminal No. 4:14-MJ-158

CRIMINAL COMPLAINT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

On or about January 17, 2013, in the Fort Worth Division of the Northern District of Texas, **FLORI MATI**, a/k/a "Florine Shaw" and **DAVID MBUGUA**, defendants, for the purpose of executing and attempting to execute a scheme and artifice to defraud and to obtain money by means of materially false representations, as described below, knowingly placed in an authorized depository for mail, to be sent and delivered by the Postal Service, and knowingly caused to be delivered by mail, an envelope addressed to Boost Academy, 201 Bedford-Euless, Suite 109, Hurst, Texas 76053, containing a check in the amount of $34,872.84 made payable to Boost Academy.

In violation of 18 U.S.C. §§ 1341 and 2.

1. I am a Special Agent of the Federal Bureau of Investigation (FBI). I have been a Special Agent for approximately 10 years. I am currently assigned to the FBI's Dallas Division, Fort Worth Resident Agency. My responsibilities including conducting investigations involving allegations of public corruption, fraud against the government and civil rights violations. In the course of my career with the FBI, I have participated in the execution of search warrants and arrest warrants, and have been the affiant of same.

I have personally participated in this investigation and I am thoroughly familiar with the information contained in this affidavit.

2. The United States Department of Education is a department of the United States government responsible for regulating and funding the Supplemental Education Services (SES) program under Title I, Part A of the Elementary and Secondary Education Act of 1965, as amended and reauthorized by the No Child Left Behind Act of 2001.

3. Under the No Child Left Behind Act, federal funds were distributed to state educational agencies, which, in turn, distributed the funds to local educational agencies (e.g. school districts) in the form of sub-grants.

4. Local educational agencies were permitted to use a portion of their federal allocation to fund a SES program. The purpose of the SES program was to provide parents of eligible students attending Title I schools that have not made adequate yearly progress (AYP) in increasing student academic achievement for three years to be provided with opportunities and choices, to help ensure that their children achieve at high levels. The SES program provides extra academic assistance for eligible children. Students from low-income families who are attending Title I schools that are in their second year of school improvement (i.e. have not made AYP for three years), in corrective action, or in restructuring status, are eligible to receive the services for one year.

5. State educational agencies were required to identify entities, including for-profit businesses, which were qualified to provide tutoring. To become a state-approved tutoring provider, an entity was required to meet the eligibility criteria established by the state educational agency.

6. Once a tutoring provider was approved by the state, it was eligible to enter into contracts with local educational agencies to provide tutoring at eligible schools.

7. Tutoring was provided at no cost to eligible students. Tutoring providers billed the local educational agency for the hours of tutoring provided, and the local educational agency paid for the tutoring with federal grant money.

8. The local educational agency was responsible for providing parents of students at eligible schools with information about all of the tutoring providers under contract. Parents were allowed to choose and/or rank which tutoring provider would be permitted to tutor their child.

9. The Texas Education Agency (TEA) is a state educational agency that received federal grant funds under the No Child Left Behind Act, to be further distributed to local educational agencies in the form of sub-grants for SES tutoring services.

**Subject Companies**

10. Wise Links, LLC - On April 25, 2011, a Certificate of Formation was filed with the Texas Secretary of State for Wise Links, LLC. (Wise Links). FLORINE MATI (MATI) was listed as the sole member of the company.

The address listed for MATI was 1220-G Airport Freeway, #511, Bedford, Texas 76022. On June 20, 2012, an Assumed Name Certificate for Wise Links was filed, listing the assumed name for that entity as Champions Mind. On October 31, 2012, a Statement of Change of Registered Office/Agent was filed with the Texas Secretary of State for Wise Links. The new registered agent was listed as DAVID MBUGUA (MBUGUA), whose address was listed as 2131 North Collins Street, Suite 517, Arlington, Texas 76011. These same entities will hereinafter be referred to collectively as "Wise Links."

11. Diverse Links, Inc. - On May 04, 2011, a Certificate of Formation was filed with the Texas Secretary of State for Diverse Links, Inc. (Diverse). MATI was listed as the sole director of the company. The address listed for MATI was 1220-G Airport Freeway, #511, Bedford, Texas 76022. On May 06, 2011, an Assumed Name Certificate for Diverse Links was filed, listing the assumed name for that entity as Diverse Learning, Inc. These same entities will hereinafter be referred to collectively as "Diverse."

12. Boost Academy – A search of records from the Texas Secretary of State for Boost Academy (Boost) returned negative results. However, your Affiant reviewed a business account application from Wells Fargo Bank (Wells Fargo), dated September 22, 2012. This application was in the name of FLORINE KARIMI MATI, DBA BOOST ACADEMY. The application listed MATI as the sole owner for the account, and she was the only individual listed as an authorized signer on the account.

13. Avenue Academy – A search of records from the Texas Secretary of State for Avenue Academy (Avenue) returned negative results. However, your Affiant reviewed a business account application from Wells Fargo, dated September 22, 2012. This application was in the name of DAVID MBUGUA, DBA AVENUE ACADEMY. The application listed MBUGUA as the sole owner for the account, and he was the only individual listed as an authorized signer on the account.

14. Unless otherwise noted, the above-referenced companies, being Wise Links, Diverse, Boost, and Academy, are hereinafter referred to collectively as the "subject companies."

15. Investigation has shown that the subject companies are related entities, being operated under the control and direction of MATI and MBUGUA. Indicators to support this assertion include:

a) A former employee of Diverse (Employee #1) was interviewed, who advised that all four of the subject companies were operated out of the same office in Hurst, Texas. Investigation has determined this location to be 204 West Bedford Euless Road, Suite #109, Hurst, Texas 76053. Your affiant has reviewed a commercial lease agreement, with a commencement date of October 01, 2012, for property located at 204 West Bedford Euless Road, Suites 105, 107 and 109. MATI signed the lease as "Tenant."

b) Employee #1 advised that the subject companies were run as "one big operation." Further, Employee #1 advised that MATI and MBUGUA formed the various companies to try and hide the true ownership of them, in an effort to obtain as much SES business as possible from various school districts. In an effort to further hide the true ownership, Employee #1 advised that MATI and MBUGUA utilized different mailing addresses for the companies, and utilized different people to sign contracts with school districts on behalf of the subject companies. Employee #1 stated that MATI and MBUGUA were together "90%" of the time, and worked on virtually everything together while operating the subject companies.

Employee #1 also stated that MATI and MBUGUA shared business resources amongst the subject companies.

c) An interview was conducted of a former Diverse employee (Employee #2), who stated he/she was hired by MATI to work for Diverse. However, towards the end of his/her employment, Employee #2 was taking directions from both MATI and MBUGUA, and he/she could have been doing work for either Diverse or Wise Links.

d) As described further in this Affidavit, students were enrolled for SES tutoring services with each of the above-referenced companies. In numerous instances, the enrollments were made utilizing the same Internet Protocol addresses originating at MATI's and MBUGUA's residence, as well as their joint office location in Hurst, Texas.

e) On October 01, 2013, MATI and MBUGUA appeared together at the Fort Worth Independent School District (FWISD) Administration Building for a meeting with FWISD representatives. The purpose of the meeting was to discuss the status of SES billing for the subject companies. During that meeting, which was consensually-recorded, MATI advised that her two companies were Diverse and Boost. MBUGUA advised that his two companies were Avenue and Wise Links.

f) On November 21, 2013, MATI and MBUGUA again appeared at the FWISD Administration Building for a meeting with FWISD representatives. The purpose of this second meeting was to discuss the status of SES billing to their companies. During that meeting, which was consensually recorded, MATI advised that she and MBUGUA would be traveling to Kenya soon to be married.

g) Public record checks, witness interviews, and physical surveillance indicate that MATI and MBUGUA reside together at 3613 Rolling Meadows Drive, Bedford, Texas 76021.

16. Beginning in 2012, the various school districts throughout the State of Texas began to develop information that the subject companies were committing fraud related to the SES program, and reported their findings to the TEA. These school districts included DISD, SAISD, and FWISD.

Complaints from the various school districts were similar in nature, in that they included allegations of falsified enrollments and falsified student attendance records, both of which resulted in the districts being billed for services not rendered.

17. The DISD met the definition of a local educational agency pursuant to the No Child Left Behind Act. DISD received a sub-grant from the TEA and offered a SES program to eligible students at eligible schools. The DISD contracted with Diverse to provide SES tutoring services, including the 2011-2012 school year. MATI signed the contract on behalf of Diverse. Based upon irregularities identified by DISD with Diverse's billing, the DISD engaged an outside consulting firm to investigate Diverse's invoices submitted to DISD. The review period for this engagement were invoices billed to DISD from January 2012 to August 2012. As part of the outside consultant's investigation, an examination was conducted of supporting documentation in order to determine the accuracy of the amounts owed by DISD to Diverse. In addition, the outside consultant interviewed over 600 students, in an effort to determine whether they received tutoring from Diverse. Based upon the outside consultant's investigation, which was presented to the DISD in March 2013, only 30% of the billing was estimated to be accurate and owed to Diverse for the above-referenced time period. The outside consultant noted items in their report including: (1) staggered signatures on attendance and payment reports, in which the students interviewed stated they were told to sign forms that had multiple lines all at one time, and to indent so that it would look like the signatures were written at different times;

and (2) multiple student interviews which revealed the attendance forms were signed at times and places other than during a tutoring session.

- Irregularities were also detected in Diverse's business practices with DISD for the 2012-2013 school year, which occurred prior to the issuance of the outside consultant's report. A standard provision in SES provider contracts, and/or SES program guides, is that the SES provider not enroll a student for SES tutoring services. The program requires that the student's parent register the child for the SES tutoring services. However, despite this prohibition, Employee #1 and Employee #2 both advised that MATI hired temporary workers to enter student information into the SES enrollment system (EZSES) for the purpose of enrolling them. In addition, the ED/OIG conducted an analysis of student enrollments, and determined that approximately 4,237 DISD students were mass enrolled for SES tutoring services, by the subject companies using several different Internet Protocol (IP) addresses originating in the country of Kenya. A financial analysis has shown that MATI and/or MBUGUA wire-transferred SES-originating funds to various accounts in Kenya between 2009 and 2013.

18. The SAISD met the definition of a local educational agency pursuant to the No Child Left Behind Act. SAISD received a sub-grant from the TEA and offered an SES program to eligible students at eligible schools. The SAISD contracted with all four of the subject companies to provide SES tutoring services for the 2012-2013 school year. An internal investigation conducted by the SAISD showed that the school district was billed for tutoring services that did not take place, and that numerous students were enrolled for SES tutoring without the knowledge and consent of their parents.

**Probable Cause for Criminal Complaint - FWISD**

19. The FWISD met the definition of a local educational agency pursuant to the No Child Left Behind Act. FWISD received a sub-grant from the TEA and offered an SES program to eligible students at eligible schools during the 2012-2013 school year.

20. Diamond Hill Jarvis High School was a school within FWISD that was eligible for the SES program during the 2012-2013 school year.

21. O.D. Wyatt High School was a school within FWISD that was eligible for the SES program during the 2012-2013 school year.

22. The subject companies entered into contracts with the FWISD, for the 2012-2013 school-year, as follows:

a). Wise Links entered into a SES tutoring contract with FWISD, with an effective start date of October 5, 2012. MBUGUA signed the contract on behalf of Wise Links, and listed his position with the company as Program Manager.

b). Diverse entered into a SES tutoring contract with FWISD, with an effective start date of October 3, 2012. MATI signed the contract on behalf of Diverse, and listed her position with the company as Director.

c). Boost entered into a SES tutoring contract with FWISD, with an effective start date of October 3, 2012. JULIUS SAM AHOLO signed the contract on behalf of Boost, and listed his position as SES Program Manager.

d). Avenue entered into a SES tutoring contract with FWISD, with an effective start date of October 4, 2012. NAANA OTCHWAY signed the contract on behalf of Avenue, and listed her position as Manager.

23. During the 2012-2013 school year, FWISD paid the following amounts to each of the above-referenced companies for SES tutoring services:

a). Wise Links – FWISD paid approximately $26,441 for tutoring students under the SES program. The FWISD records also showed that approximately 151 students were enrolled in tutoring with Wise Links during this same school year.

b). Diverse - FWISD paid Diverse approximately $96,957 for tutoring students under the SES program. The FWISD records also showed that approximately 429 students were enrolled in tutoring with Diverse during this same school year.

c). Avenue – FWISD paid approximately $13,790 for tutoring students under the SES program. The FWISD records also showed that approximately 65 students were enrolled in tutoring with Avenue during this same school year.

d). Boost – FWISD paid approximately $36,011 for tutoring students under the SES program. The FWISD record also showed that approximately 127 students were enrolled in tutoring with Boost during this same school year.

24. As with DISD, a standard provision in SES provider contracts for FWISD, as required by the TEA, is that the SES provider not participate in registering a student for SES tutoring services. Your affiant has reviewed each of the contracts that the above-referenced companies entered into with the FWISD, as noted in paragraph 24 above. The contracts state, "Providers are responsible for ensuring that their employees do not submit student information through EZSES to facilitate any portion of the enrollment process. " However, despite this prohibition, Employee #1 and Employee #2 advised that MATI hired temporary workers to enter student's information into EZSES for the purpose of enrolling them. Also, Employee #1 admitted to enrolling students online, at the direction of MATI, despite the fact that both Employee #1 and MATI had both taken training that explained that this practice was prohibited. When Employee #1 questioned MATI about the policy, MATI told him/her, "To just do it." MATI instructed Employee #1 to enroll only one student every five to ten minutes. MATI told Employee #1 that the school districts were picking up on the IP addresses. MATI explained that when parents actually enrolled their children online at a SES open house, hosted by the school districts, the enrollments took between five and ten minutes per student.

MATI explained that if they kept to that same pattern at the office, it would look like the parents actually enrolled their children versus the subject companies doing it. According to Employee #1, MBUGUA also instructed other employees to enroll students for Avenue and Wise Links.

25. Employee #1 witnessed an employee, who was working for MBUGUA, install software on various laptop and desktop computers at MATI and MBUGUA's office. The software was called "hide my ass." When Employee #1 questioned MATI as to what it was for, MATI responded that it was used so they could make sure the school districts and the TEA could not link the same computers to the subject companies, while they enrolled students in the EZSES system for tutoring.

26. According to an analysis of EZSES student registration records, performed by the ED/OIG, approximately 581 FWISD students were mass registered for SES tutoring services from 13 different IP addresses. These registrations occurred over a five-day period in October 2012, and all 581 student registrations listed one of the four above-referenced companies as their "first choice." Your affiant requested subscriber information from the various Internet Service Providers (ISP) that managed these IP addresses. Your Affiant learned that most ISP's only maintain subscriber information on IP addresses for approximately 180 days, thus subscriber information was not available to your Affiant on a number of the IP addresses.

However, positive responses were received from Charter Communications, Inc. (Charter), AT&T Services Inc. (AT&T) and Verizon Communications (Verizon). These positive responses link MATI and MBUGUA to the registrations, as follows:

a). IP address 76.255.83.227 was utilized to enroll approximately 112 FWISD students through the EZSES enrollment system on October 22, 2012. AT&T provided records to your Affiant which showed MATI was the registered user of this IP address, and that the service address was 3613 Rolling Meadows Drive, Bedford, Texas 76021, the known residence of MATI and MBUGUA. Employee #1 advised your affiant that MATI and MBUGUA did some of the enrollment themselves from their house and other places. Of the 112 students registered from this IP address on that date, at least one of the subject companies was listed as the "first choice" in the enrollment. For background, parents are allowed to enter up to three different SES providers during the enrollment process, ranking each one in their order of preference. Each of the student records listed the "parent" as the enrolling party.

b). IP address 66.169.186.45 was utilized to enroll approximately 45 FWISD students through the EZSES enrollment system on October 22, 2012. Charter provided records to your Affiant which showed Diverse was the registered user at 204 West Bedford Euless Road, Hurst, Texas 76053. Of the approximately 45 students registered from this IP address on this date, at least one of the subject companies was listed as the "first choice" in the enrollment. Each of the student records listed the "parent" as the enrolling party.

c). IP address 99.101.121.75 was utilized to enroll approximately 55 FWISD students through the EZSES enrollment system between October 23-24, 2012. AT&T provided records to your Affiant which showed MATI was the registered user of this IP address for those dates, and that the service address was 3613 Rolling Meadows Drive, Bedford, Texas 76021, the known residence of MATI and MBUGUA. Of the approximately 55 students registered from this IP address on these two dates, at least one of the subject companies was listed as the "first choice" in the enrollment. Each of the student records listed the "parent" as the enrolling party.

d). IP address 64.134.144.35 was utilized to enroll approximately 26 FWISD students through the EZSES enrollment system on October 23, 2012.

AT&T provided records to your Affiant which showed that particular IP address was assigned to Starbucks at 1324 West Pipeline Road, Hurst, Texas 76053, and that particular IP address provided public WiFi Internet access. Of the approximately 26 students registered from this IP address on this date, at least one of the subject companies was listed as the "first choice" in the enrollment. Each of the student records listed the "parent" as the enrolling party.

e). IP address 71.252.177.134 was utilized to enroll approximately 30 FWISD students through the EZSES enrollment system on October 26, 2012. Verizon provided records to your Affiant which showed Phylecia Piece was the registered user at 1164 Valley Oaks Drive, Lewisville, Texas 75067. Employee #1 advised your affiant that an individual known to him/her as "Phylecia" was hired to work as MBUGUA's assistant for a period of time. Of the approximately 30 students registered from this IP address on these two dates, at least one of the subject companies was listed as the "first choice" in the enrollment. Each of the student records listed the "parent" as the enrolling party.

27. On October 22, 2012, FWISD student L.C. was enrolled in SES tutoring services from one of the IP addresses referenced above, being 76.255.83.227, which originated from MATI's residence. L.C. was a student at Diamond Hill Jarvis High School during the 2012-2013 school-year. L.C.'s enrollment listed Boost as the "first choice" for SES providers, and it listed L.C.'s parent as the enrolling party. A review of billing records, provided by FWISD, showed Boost billed FWISD for tutoring L.C. on the following dates in 2012: December 17, 20, 22, and 29. Your affiant interviewed L.C., who stated she received no tutoring during the 2012-2013 school year. Further, L.C. advised that some people (hereinafter referred to as "representatives") came by her home several times in approximately early 2013. These representatives told L.C. that L.C. and L.C.'s brother needed to go to after-school tutoring. These representatives eventually got L.C. and L.C.'s brother to sign some papers the last two times they stopped by.

When L.C. asked why, the representatives said it was for L.C.'s tutoring "hours." L.C. advised the papers looked like some type of a log. In exchange for signing the papers, both L.C. and L.C's brother received Android computer tablets. The representatives told L.C. the tablets were for completing the tutoring hours. Even though they received the tablets, L.C. signed the papers more so they would leave L.C.'s apartment. FWISD was falsely billed $827.17 for tutoring L.C. on the dates referenced above, on invoice number 2012-12-60-28-9688, dated January 08, 2013. The total amount billed by Boost to the FWISD on this particular invoice was $7,106.17. This invoice was processed by the FWISD accounts payble department for payment, and contained amounts from multiple invoices. Theses invoices caused a check in the amount of $34,872.84, to be mailed to Boost via the United States Postal Service on or about January 17, 2013. Your affiant showed L.C. a photo spread, containing the pictures of six females. L.C. advised that although it had been awhile, one of the six females resembled one of the representatives. L.C. identified the Texas driver's license photograph of MATI.

28. On October 23, 2012, FWISD student D.B. was enrolled in SES tutoring services from IP address 173.172.54.223. D.B. was a student at O.D. Wyatt High School during the 2012-2013 school year. Although subscriber information for this IP address was not available, the analysis from ED/OIG showed that this IP address was used to register approximately 42 FWISD students on the same date. D.B.'s enrollment listed Wise Links as the "first choice" for SES providers, and it listed D.B's parent as the enrolling party.

A review of billing records, provided by FWISD, showed Wise Links billed FWISD for tutoring D.B. on December 22, 2012. D.B.'s parent was interviewed by FBI agents, who advised that D.B. did not attend any tutoring during the 2012-2013 school year. Further, D.B.'s parent advised that D.B. was an A/B student, and had no need for after-school tutoring. D.B.'s parent had no recollection of signing any papers that would permit D.B. to attend tutoring. FWISD was billed $225.00 for tutoring D.B. on the date referenced above, on invoice number 2012-12-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 dated January 08, 2013. The total amount billed by Wise Links to the FWISD on this particular invoice was $15,375.00. This invoice was processed by the FWISD accounts payable department for payment, which caused a check to be mailed to Wise Links via the United States Postal Service on or about January 22, 2013.

29. Your affiant has learned that it is customary to have students sign an attendance log at SES tutoring sessions, documenting that student's presence for billing purposes. During Employee #2's interview, Employee #2 told your affiant that MATI instructed him/her to travel to the homes of FWISD and DISD students in an effort to have them sign attendance sheets for tutoring sessions in the future. Employee #2 was told by MATI to explain to the students that, by signing the sheets, they were saying they would attend the tutoring for those dates and times listed on the sheets. After obtaining the student's signatures, Employee #2 brought the signed attendance sheets back to MATI.

Employee #2 did not know if any of these students went to the tutoring or not, but he/she suspected they did not. Some of the students that Employee #2 spoke with said that they would not be going to the tutoring sessions, or that they did not know where to go for the tutoring sessions. After turning in the signed attendance/time sheets to MATI, she never did or said anything to Employee #2 to show she followed up and made sure the students actually attended the tutoring sessions.

30. Employee #2 also told your Affiant that MATI and MBUGUA gave him/her stacks of these attendance sheets, and instructed him/her to sign the sheets as the company representative. By signing these sheets as the company representative, Employee #2 was certifying that the tutoring dates/time listed on the sheets was true and correct. Employee #2 did not feel comfortable signing these forms, because he/she did not know if the tutoring was actually done.

31. In early 2013, the FWISD confronted Mati and Mbugua regarding irregularities in the billings submitted by the subject companies. Specifically, the FWISD representatives told them that students were saying they had not been tutored and that parents had not enrolled their children in the SES program. MATI and MBUGUA later advised FWISD they held make-up sessions in the summer of 2013, claiming to have been re-tutoring students, so that they would not have to re-pay any SES funds to FWISD. Employee #1 advised your affiant that he/she was instructed by MATI to create a list of students that needed to be re-tutored, complete with their home addresses.

MATI utilized this list by going door-to-door at students' homes, obtaining signatures from students on attendance logs in exchange for giving them a computer tablet. MATI would have the students sign an attendance log for an entire month's worth of tutoring on Saturdays. However, when the tutoring sessions were actually held, MATI told Employee #1 that no students showed up. The paperwork was still submitted to FWISD to show the students received tutoring, based on the attendance logs that MATI had the students sign at home.

32. Your affiant also interviewed a third employee (Employee #3), who worked for MATI and MBUGUA as a tutor. During the course of his/her employment, Employee #3 was asked by MBUGUA to sign multiple attendance sheets for sessions he/she did not tutor. Employee #3 resigned his/her position with MATI and MBUGUA at the end of November 2012. However, your Affiant has reviewed electronic attendance records, which lists Employee #3 as the tutor of record for sessions that occurred in December 2012, after she/he had left their employment. The tutoring sessions listed Wise Links as the SES provider. Invoices were then submitted to the FWISD for these sessions, which listed MBUGUA as the point of contact for any questions related to the invoice.

33. Your affiant also interviewed a fourth employee (Employee #4), who was hired by MATI to work for Diverse as a tutor for FWISD students. Although the majority of Employee #4's paychecks came from Diverse, he/she also received a paycheck on one occasion from Champions Mind (Wise Links), and on one occasion from Boost.

Most of the time Employee #4's paychecks were mailed to him/her, but at times MATI or MBUGUA hand delivered the paychecks to him/her. On one occasion in late June 2013, MATI and MBUGUA brought paperwork to the library and asked Employee #4 to sign a form indicating he/she tutored a particular student. The student had come to the library that day and signed attendance paperwork indicating he had completed all the required hours of tutoring. That way the student could receive a tablet computer that Diverse offered to kids who completed the tutoring program. Employee #4 did not recognize the student's name and he/she had not tutored him, so Employee #4 refused to sign the form. Your affiant also reviewed invoices from the subject companies, which were billed to the FWISD for tutoring services that allegedly occurred in December 2012 and for which Employee #4 was the tutor of record. This review showed that FWISD was billed for tutoring sessions on dates that Employee #4 stated he/she did not work.

34. Based on the foregoing, probable cause exists to believe that FLORINE K. MATI and DAVID MBUGUA violated Title 18 U.S.C § 1341, by devising a scheme to defraud the Fort Worth Independent School District (FWISD) and causing the FWISD to mail checks through the United States Postal Service (USPS) in January 2013, all in the Northern District of Texas.

MATTHEW T. WILKINS
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me on this 20th day of March, 2014, in Fort Worth, Texas at 4:46 a.m./p.m.

JEFFREY CURETON
United States Magistrate Judge